[Civ. No. 1300. Fourth Appellate District.—November 5, 1934.]

HARRY FAITH et al., Appellants, v. E. MORELLO et al., Respondents.

W. H. Stammer and Percy C. Church for Appellants.

Ray W. Hays for Respondents.

JENNINGS, J.—A rehearing was granted in this case in order to give further consideration to certain contentions advanced by appellants. Upon such reconsideration we are of the opinion that the contentions of appellants are meritorious and should to some extent be sustained. Appellants do not complain that this court in its prior decision incorrectly disposed of the principal question which is presented on this appeal, and since we now entertain the conviction that our opinion heretofore rendered made proper disposition of such question, we therefore adopt so much of said opinion as is decisive of said question. It is as follows:

"This is an appeal by plaintiffs from a judgment rendered in favor of defendants by the Superior Court of Fresno county. The action was instituted by plaintiffs for the purpose of obtaining a decree compelling specific performance by defendants of a certain contract entered into between plaintiffs and defendants whereby defendants had agreed to sell and plaintiffs had agreed to buy a certain parcel of land for a stipulated sum of money. The complaint alleged that upon execution of the contract plaintiffs had entered into possession of the property and had fully performed their part of the agreement, that defendants had wrongfully secured possession of the property and refused to surrender possession to plaintiffs who were entitled thereto. The defendants filed an answer and cross-complaint wherein they admitted execution of the contract and that they had retaken possession of the land, but alleged that they had done so for the reason that plaintiffs had violated the terms of

the contract of sale. The pleading concluded with the prayer that the title of defendants to the property be quieted as against the claims of plaintiffs.

"It is conceded that there was no material conflict in the evidence which was submitted during the trial of the action. The main question presented on this appeal relates to the construction by the trial court of a certain provision of the aforesaid contract. It is the contention of appellants that the trial court incorrectly interpreted this provision. Consideration of this contention necessitates a brief statement of the facts which were developed by the evidence.

"On August 4, 1930, respondent, Paradise Vineyards, Inc., was the owner of a tract of land in Fresno county comprising approximately 320 acres. On this date the said corporation entered into a written contract with appellants whereby it agreed to sell and appellants agreed to purchase the property for the sum of $90,000, of which amount the sum of $2,500 was paid in cash on the execution of the agreement and a further sum of $22,500 was to be paid from the proceeds to be derived from the sale of grapes that were then being grown on the land. The balance of the purchase price which amounted to the sum of $65,000 was to be paid in specified annual instalments. The contract recited that 'both parties hereto understand that said property is subject to' a lien of the Bank of Italy in the sum of $46,250. It is also evident from the terms of the contract that the lien of the bank was one which existed by virtue of a trust deed or mortgage executed by respondent and that by the terms thereof the respondent was obligated each year to make a payment of $7,500 on account of the principal of the indebtedness to the bank and also to make semiannual payments of interest due on the unpaid balance of the principal. The contract between the respondent corporation and appellants contained the following provision which it is contended the trial court improperly construed:

" 'In the event the income from said real property, due to frost injury, market conditions, or other conditions beyond the control of buyers, is so reduced that it is insufficient, after deducting operating costs, to make the payments herein required to be made by buyers, then should buyers and both of them be unable financially to make said payments from funds or other resources under their control,

seller agrees that they will for such year consent to an extension of the payment accruing for such year to the December first following, provided that the actual net income from said real property is applied towards the payment of taxes first, the payments of interest on the first incumbrance, secondly, and thirdly towards the payment of any instalments on said first incumbrance accruing during said year, and sellers expressly consent that buyers may procure from the holder of said incumbrance an extension of the instalment payment accruing in such year after the application of the net proceeds from operations of said real property have been applied as herein required. Should, however, owing to insufficient net income or insufficient resources of buyers, exclusive of income from said real property, be insufficient to prevent a foreclosure of the incumbrance on said real property and a foreclosure occur, buyer shall in that event have no cause of action or claim against seller by reason of the loss of his investment in said real property. In this connection buyers agree that they shall keep careful record of all operating expenses for each year, which record and expenses shall be furnished to seller in the event an extension is required under this paragraph.'

"The court found that after the execution of the contract appellants went into possession of the property and performed all terms, covenants, and conditions of the agreement which they were required to perform except that they failed to make the payments of principal and interest to the Bank of Italy which were due on December 1, 1931. The court also found that during the year 1931 the crops which were produced on the land were approximately one-third of the normal crops, due to excessive heat and other conditions beyond the control of appellants and that for this reason the proceeds from the sale of crops were so reduced that they were insufficient to pay the operating expenses of the property and that appellants were not nor was either of them financially able to make the payments required of them by the contract or to the bank and that there was no actual net income from the property during the year 1931. The court, however, further specifically found that by the terms of the contract appellants were bound to make the payments of principal and interest due the Bank of Italy on December 1, 1931, even though the net income from

the property during the year 1931 due to frost injury, market conditions, or other conditions beyond the control of appellants was so reduced that it was insufficient to make the payments required to be made by appellants and even though appellants were and each of them was financially unable to make such payments from funds under their control or the control of either of them and even though there was no actual net income from the property. In other words, the court so interpreted the contract that appellants were required to make the annual payments due to the bank and so construed the agreement that the obligation to make such payments was not included within the language of the provision by which the respondent corporation expressly agreed to extend for one year the payments which were specified to be made to it by appellants in the event that the net income from the property should prove insufficient to make such payments and appellants were financially unable to make the payments from their private funds.

"The language of the so-called extension clause of the contract hereinabove quoted appears to lend support to the contention of appellants. It is therein stated that if it should develop that the net income from the property, by reason of specified conditions including the very general contingency of the occurrence of conditions beyond the control of appellants, should be so reduced as to make it insufficient to make the payments which appellants were required to make by the terms of the contract and if appellants should be financially unable to make these payments from funds under their control, the respondent corporation agreed that it would 'for such year consent to an extension of the payment accruing for such year to the December first following'. The court found, and there is no contention that there was not ample evidence to support its finding, that the very situation mentioned in the extension clause did come into existence during the year 1931. The evidence showed that this year was an unusually dry year and that the quantity of crops produced was slightly more than one-third of that which had been produced during the preceding year and that consequently there was no net income derived from the land but, that, on the contrary, appellants paid more than six thousand dollars from their private funds to supply

a deficiency in the amount required to pay operating expenses. The undisputed evidence also showed that neither appellants jointly were, nor either of them severally was able to make the payments required of them by the terms of the contract. This situation which was exactly the one which was evidently anticipated might occur would seem to fall within the express terms of the aforesaid clause of the contract and to require the respondent corporation to grant to appellants an extension of one year in the payment of the instalment which was due from appellants on December 1, 1931.

"Furthermore, it is a familiar and well-established rule that, in the interpretation of written agreements, the essential element of the intent of the parties to a contract is to be discovered by a consideration of the instrument in its entirety rather than by an examination of detached portions of the instrument (*Hunt* v. *United Bank & Trust Co.*, 210 Cal. 108 [291 Pac. 184] ; *Nakagawa* v. *Okamoto,* 164 Cal. 718 [130 Pac. 707] ; *Mente & Co., Inc.,* v. *Fresno Compress & Warehouse Co.,* 113 Cal. App. 325 [298 Pac. 126] ; 6 Cal. Jur. 259). The application of this rule lends further support to the contention advanced by appellants. Analysis of the lengthy and complicated contract which was entered into between the respondent corporation and appellants shows that on the date of the agreement the corporation was the owner of the land; that the property was subject to the lien of a trust deed or first mortgage which had been executed by the corporation to secure the payment of an indebtedness owing from the corporation to the Bank of Italy; that the corporation was obligated on December 1st of each year to make a payment of $7,500 on the principal of the indebtedness and on June 1st and December 1st of each year to make semi-annual payments of interest on the balance of such indebtedness; that on the date of the agreement the principal of this indebtedness was $46,250. As above noted, appellants agreed to purchase the property for the sum of $90,000, of which they paid $2,500 in cash and agreed to make a further payment of $22,500 from the proceeds to be derived from the sale of grapes which were then growing on the land. The balance of the purchase price, amounting to $65,000, was to be paid as follows: '$7500.00 on or before December 1, 1931;

$7500.00 on or before December 1, 1932; $7,500.00 on or before December 1, 1933; $7500 on or before December 1, 1934; $6000.00 on or before December 1, 1935; $6000.00 on or before December 1, 1936; $5000.00 on or before December 1, 1937; and $5000.00 on or before the first day of December of each succeeding year until the entire balance of the purchase price hereunder shall have been paid.' Deferred payments were to draw interest at the rate of 7 per cent per annum payable on December 1 of each year. It was expressly provided that appellants were required on the first day of December and the first day of June next succeeding the date of the agreement to make the semiannual payments of interest which should be due on those dates on the balance of the principal indebtedness due the Bank of Italy 'but aside from the payment of the interest on this incumbrance which must be made semi-annually, buyers' interest shall be paid annually on the first day of December of each year'. The buyers were expressly accorded the privilege of making 'all payments accruing hereunder to the Bank of Italy directly, in lieu of making payments to seller, and payments so made to the Bank of Italy shall as and when made be credited as payments upon this contract'. It was then further provided that if the interest on the unpaid balance of the indebtedness due the Bank of Italy were paid 'as it matures each year by seller, in accordance herewith, that the balance of the accruing interest on this contract may be added to the principal until such time as a flat loan can be secured on said real property from the Bank of Italy or elsewhere, and that from the time the flat loan is secured buyer shall thereafter, on the 1st of December of each year, pay all accruing interest for the previous year under this contract'. The next paragraph, after reciting that the property is subject to the aforementioned lien of the Bank of Italy in the amount heretofore specified, contains an express agreement by the seller to make payment on or before December 1, 1930, of the instalment due on the principal of the indebtedness due the Bank of Italy and of the interest due the bank on said date. Then follows a statement to which both parties to the contract expressed their agreement that, if the Bank of Italy could be induced to accept a less sum than the amount of the $7,500 instalment which would be due on

the principal of the indebtedness on December 1, 1930, the amount thus retained should be used for drilling an additional well and installing a pump provided that such money, together with funds 'available from buyer', would be sufficient for such purpose. The succeeding paragraph contains a covenant of mutual agreement that both parties will cooperate in attempting to secure from the Bank of Italy or from any other lender a flat loan on the property for a term of three years at an interest rate not to exceed 7 per cent per annum and that the parties will join in the execution of whatever instruments may be required for the securing of such a loan. The next paragraph contains the socalled extension agreement of the seller as hereinbefore quoted in full. The paragraph following contains an express covenant by appellants that, after the payment of the additional sum of $22,500 has been made from the net proceeds of the 1930 crop, whatever balance of such net proceeds remains will be deposited in a separate bank account to be used in taking care of the property for the year 1931, 'including the payment of taxes' and appellants declare themselves trustees of the proceeds of the crops for the purpose of making the payments required. It is further specified in this paragraph that appellants agree that, prior to the commencement of operations in the year 1931, they will convince the seller and the bank that they have sufficient resources available to farm and take care of the land properly during the year 1931 'including payments of taxes and interest to the Bank of Italy'. A number of additional paragraphs follow which contain provisions that are not particularly helpful in disclosing the intent of the parties. The final paragraph contains the usual provision that if appellants as buyers fail to make any payment required to be made by them or to perform any of the terms or conditions required to be performed by them, the seller, respondent corporation, will be authorized, at its election, to cancel and terminate the contract, in which event appellants agree to deliver possession of the property to the respondent corporation and all payments theretofore made by appellants under the contract shall be retained by the corporation as a reasonable rental of the property.

"From the above-described complicated and not altogether unambiguous provisions of the contract certain deductions

respecting the intention of the parties may reasonably be drawn. In the first place, it appears evident that the parties intended and expected that whatever payments that were to be made under the contract, other than the initial payment of $2,500, would be derived from the net proceeds of crops that would be grown on the land. In the second place, it is obvious that the parties recognized the existence of a lien which had been placed upon the property by the respondent corporation and a definite obligation of the seller to make an annual payment of the sum of $7,500 on the principal of the indebtedness which the lien secured and two semiannual payments of interest on the unpaid balance of such indebtedness. In the third place, it is apparent that appellants were expressly permitted to deal directly with the owner and holder of this lien and to make to such owner any payments required to be made by the contract. In the fourth place, it is evident that the respondent corporation was primarily interested in securing from appellants, each year, sufficient money to meet the annual payment of the instalment due on the principal and the semiannual interest charges.

■ "Taking specifically the language of the extension clause of the contract whose proper interpretation presents the legal problem which is here involved, we find that the respondent corporation expressly agreed that, if the net income from the property due to certain stated conditions, including the very general contingency of 'other conditions beyond the control of buyers', should be insufficient to enable the buyers to make the payments required of them and if the buyers should further be financially unable to make such payments from their private funds or resources, it would consent to an extension of the payment accruing for such year to the December first following. What were these payments which by the terms of the contract appellants were required to make during the year 1931? They were first a payment of $7,500 on the $65,000 balance and, second, a payment of interest on this balance at the rate of 7 per cent for one year. Both of these payments were to be made on December 1, 1931. If these payments were not made, due to insufficiency of net income from the property caused by any of the specified conditions, the respondent corporation became obligated to grant an extension.

This, however, had nothing to do with the corporation's obligation to make payments on the principal and interest of the indebtedness which it owed to the third party. That obligation was separate and distinct from the obligations of appellants as defined by the contract. However, the existence of the obligation of the respondent corporation was specifically recognized and this respondent hoped and expected that appellants would be able to make the payments required by the contract and appellants were expressly granted the option to make payments direct to the third party. Appellants were expressly required by the proviso which is contained in the extension clause to apply whatever net income that should be derived from the property during the year 1931 to the payment of certain specified charges. They were required first to pay the taxes assessed against the property; second, to pay the interest on the 'first incumbrance'; and third, to pay any instalments 'on said first incumbrance accruing during the year'. With respect to the application of the net income to the payment of any instalments of the principal indebtedness secured by the so-called 'first incumbrance' there is a modification consisting of an express consent by the respondent corporation that appellants might procure from the holder of such incumbrance an extension of the instalment payment which was due from the corporation after the net proceeds from the property had been applied to the payment of taxes and interest on such first incumbrance. What would happen if the net income from the property were insufficient and appellants were unable from their private funds to make the payments required of them and the holder of the first incumbrance should bring an action of foreclosure? This very contingency was evidently considered, for the last sentence of the extension clause expressly provides that in such event 'buyer shall have no cause of action or claim against seller by reason of the loss of his investment in said real property'.

"In support of the trial court's interpretation of the so-called extension clause respondents rely on certain language which appears in another part of the contract and upon certain evidence which was produced whose effect was, it is urged, to show a practical interpretation of the extension

clause by appellants which amounted to the same interpretation placed upon the extension clause by the trial court.

"The language of the contract upon which respondents thus rely is as follows: 'Buyers must pay interest semiannually on June 1st and December 1st, next succeeding, to the amount of interest accruing on the present incumbrance now held by the Bank of Italy, or on any incumbrance or substitution thereof that may be placed thereon, but aside from the payment of the interest on this incumbrance which must be made semiannually, Buyers' interest shall be paid annually on the first day of December of each year.' It is contended that the foregoing language clearly imposed upon appellants the definite duty to make the semiannual interest payments which were required to be made on the unpaid balance of the principal indebtedness secured by the lien of the so-called first incumbrance and indicated that the payment of interest charges on the first incumbrance was not covered by the language of the extension clause.

"However, if it be assumed that the above-quoted language imposed upon appellants the obligation of paying the semiannual interest charges on the first incumbrance it must be conceded that this duty was one that was created solely by the contract. No one has had the temerity to suggest that it came into existence in any other manner. Certainly it could not have been imposed by the terms of the trust deed or mortgage which represented the lien of what is so frequently called the 'first incumbrance' in the contract. The first incumbrance was in existence when the contract between the parties to the present action was executed. It was placed upon the property either by the respondent corporation or by one of its predecessors in interest. It is nowhere suggested, nor does the record contain any evidence tending to show, that appellants were parties to the trust deed or mortgage which was owned by the Bank of Italy. Since the obligation to make the semiannual payments of interest charged on the first incumbrance was one that was imposed upon appellants solely by the terms of the contract it would appear that it is clearly covered by the following language of the extension clause. 'In the event the income from said real property . . . is so reduced that it is insufficient, after deducting operating costs, *to make the payments*

*herein required to be made by buyers'* (italics ours). The intent of the respondent corporation that the payment of interest on the first incumbrance should be considered as an obligation imposed upon appellants by the contract is further indicated by the language of the proviso which appears in the extension clause wherein the promise of the respondent corporation to grant an extension is qualified by the condition that the actual net income from the property shall be applied first to the payment of taxes, second to the payment of interest on the first incumbrance, and third, to the payment of any instalments on the principal of the first incumbrance that have become due during the year.

''The contention of respondents that there had been a practical interpretation of the contract by appellants which coincided with the trial court's interpretation is based upon certain evidence which was produced during the trial. It was shown that prior to June 1, 1931, appellants had negotiated directly with the Bank of Italy with respect to the payment of interest on the first incumbrance which would be due on June 1, 1931, and that as a result of these negotiations the bank, on May 28, 1931, accepted from appellants their promissory note for the sum of $1,582.29, representing the interest which would be due on the first incumbrance on June 1, 1931, payment of which note was secured by a chattel mortgage executed by appellants and likewise delivered to the bank. By this action in thus dealing directly with the bank and by thus paying the interest on the first incumbrance to the bank, it is argued that appellants themselves so construed the provisions of the contract as to indicate that they recognized that they were obligated to make the semiannual payments of interest on the first incumbrance and further recognized not only a distinct obligation to pay the interest, but an obligation to pay the interest direct to the holder of the first incumbrance. The next step in this line of reasoning is that the recognition of an obligation to pay the interest direct to the third party amounted to a practical admission by appellants that all payments, both of interest and of instalments of the principal of the first incumbrance, were required to be paid by them not to the respondent corporation but to the holder of the first incumbrance. The final step in this reasoning is that the trial court correctly interpreted the

language of the extension clause in exact conformity with the practical interpretation placed upon it by appellants themselves.

"There are two difficulties which prevent the acceptance of this reasoning. In the first place it does not take into account the fact that whatever obligation rested upon appellants to make any payments on the first incumbrance was an obligation which was created by the contract. These payments were therefore payments which were required by the contract to be made by the buyers (appellants) and as such were included within the very language of the extension clause. In the second place the action of appellants in dealing directly with the holder of the first incumbrance cannot be construed as an admission by appellants of a distinct obligation thus to deal for the reason that appellants were expressly accorded the privilege of making all payments which should fall due under the terms of the contract directly to the Bank of Italy 'in lieu of making payments to seller, and payments so made to the Bank of Italy shall, as and when made, be credited as payments upon this contract'. In other words, appellants were given the option of making all payments required of them under the contract directly to the bank and their exercise of this option may not be construed as an admission by them that such payment so made is not included within the language of the extension clause.

"It is therefore our opinion that the trial court incorrectly interpreted the extension clause of the contract and that its finding, which expresses this improper interpretation, is not justified."

The problem which remains for solution is whether or not the finding of the trial court that neither appellants were nor either of them was financially able to make the payments required to be made by them on December 1, 1931, from funds or resources under their control or under the control of either of them is sufficiently supported by the evidence to require a reversal of the judgment, or whether this finding may be so modified in accordance with the evidence that an affirmance of the judgment may be ordered. In our prior opinion it was our conclusion that, although this finding was proper so far as it went, it required alteration and modification because it did not fully reflect the

precise situation which was disclosed by the evidence. We therefore modified finding IV of the trial court's findings by incorporating the following sentence in lieu of the last sentence but one thereof: "Although Harry Faith and Melville Levy were not, nor was either of them, financially able, to make the payments required of them on December 1, 1931, there should have been available for such payments from funds and resources under their control or under the control of one of them the sum of $1,948.39, and such sum would have been available if it had not been applied on expenditures that were not contemplated by the parties to the contract and which were not proper expenditures under the terms of the contract." The sentence in the court's finding which was replaced by the above-quoted sentence was as follows: "Harry Faith and Melville Levy were not, nor was either of them, able financially to make the payments due under the agreement or to the Bank of America from funds or other resources under their control, or the control of either of them." The reason for the modification of the finding by the incorporation of the former sentence in lieu of the latter was that examination of the record indicated that, although the evidence showed that neither Faith nor Levy were, nor either of them was, financially able to make the payment required of them on December 1, 1931, nevertheless it also appeared that there would have been available for application on such payment the sum of $1948.39 if certain expenditures which were not contemplated by the parties to the contract and which were not properly chargeable against the receipts derived from the operation of the property had not been made. The above-mentioned amount of $1948.39 was made up of four items, to wit: First, the sum of $568.51, which was the profit earned from the operation of the property during the year 1930 if appellants had not included in their statement of receipts and disbursements for this year as an item of expense the sum of $2,500, which was the amount of their initial cash payment under the contract; second, the sum of $850 paid to a receiver who was appointed in an action instituted by three persons who claimed that they were interested with appellants in the operation of the property as a joint adventure and who demanded an accounting and settlement of the business and that it be wound up and closed; third, the sum of

$308.50 paid out by the receiver from funds received by him during his operation of the property as the unpaid balance due on a certain Ford automobile which was registered in the name of appellant Faith; fourth, the sum of $221.38 which was the final cash balance in the receiver's hands when the receivership was terminated. Although the evidence indicated that appellants expended from their own funds an amount in excess of $6,000, nevertheless, since by the terms of their contract they were compelled to exhaust their own resources before they would be entitled to the privilege of an extension, they would have had available for application on the payment due from them on December 1, 1931, the aforementioned sum of $1948.39. It was therefore our conclusion that the judgment of the trial court which refused specific performance of the contract to appellants was correct and should be affirmed although the court incorrectly interpreted the language of the extension clause of the contract as requiring appellants to make the payment due on December 1, 1931, even though no profit was derived from the operation of the property during the year 1931 and even though it appeared that neither appellants jointly were, nor either of them was then, financially able to make the payment from their or his private funds.

In their petition for a rehearing appellants complain that the trial court's finding of financial inability to make the payment due from them on December 1, 1931, was supported by the evidence produced during the trial and that the modification of this finding made by this court in its original opinion was therefore not justified. It is conceded that the inclusion by appellants of the initial cash payment of $2,500 as an item of disbursement in their written statement of receipts and disbursements for the year 1930 was improper since the contract clearly provided that the balance of the payment of $25,000, which was to be made during the season of 1930, should be paid from profits derived from the operation of the property during this season. It is therefore granted that our original conclusion that appellants embarked upon the year 1931 with a balance of $568.51 was justified by the figures which appeared in the statement of receipts and disbursements for the season of 1930 furnished to respondents by appellants after the

total amount of disbursements was reduced by the aforementioned amount of $2,500 representing the initial cash payment made under the contract. It is, however, pointed out that the statement of receipts and disbursements was not a statement of profit and loss and that appellant Melville Levy testified during the trial of the action that the operation of the property during 1930 actually resulted in a loss because of the fact that there were charges for various supplies amounting to $7,000, which remained unpaid at the end of the season of 1930. This witness further testified that of this amount approximately $2,000 had been paid by appellants, leaving unpaid and owing from appellants the sum of $5,000. It is further observed that this testimony stands uncontradicted in the record. It is then urged that our original conclusion that appellants should have had available for application on the payment due under the contract December 1, 1931, the sum of $1948.39 was incorrect since the above-described uncontradicted evidence showed that appellants still owed an unpaid balance of $5,000 for supplies furnished to them during the season of 1930 and that if the various items making up the sum of $1948.39 had been available it would have been the duty of appellants to have applied them as payments on their unpaid obligations incurred during the season of 1930.

An examination of the record has produced the conviction that the matters above outlined were regarded as being of minor importance during the trial of the action and that they then received but slight attention. The present condition of the record is such that we feel we cannot now decide them with that certainty of just disposition which should always be present when a review purports to bring litigation to a complete and final termination. The matters to which reference has here been made should be thoroughly developed at a second trial of the action.

The judgment from which this appeal has been taken is therefore reversed.

Barnard, P. J., and Marks, J., concurred.